1 .BYRNES, Judge.
Plaintiff, Philip Morris, Inc., appeals the denial of subpoenas and subpoenas duces tecum requested pursuant to LSA-C.C.P. art. 1437, 1438, and 1463, and LSA-R.S. art. 13:3821 and 13:3824 A. We affirm.
Plaintiff requested the subpoenas in connection with a matter before the Superior Court of Delaware County, State of Indiana, entitled Dunn, et al. v. RJR Nabisco Holdings Corporations, et al., No. 18D01-9305-CT-06. The plaintiffs in the Delaware case seek to establish that second hand smoke (referred to by Philip Morris as “environmental tobacco smoke”) was the cause of a cancer resulting in the death of one Mildred Wiley. The subpoenas were directed to Elizabeth T.H. Fontham, Ph.D., Vivien Chen, Ph.D., and Pelayo Correa, M.D., all affiliated with the Department of Pathology at the LSU Medical Center in New Orleans. Thé subpoenas seek the production of all raw data including computer tapes and/or disks and supporting documentation. By “supporting documentation” Philip Morris refers to “the code book, code list, copies of blank questionnaire forms, protocol documents and any addenda thereto, and any other documentation that would assist in understanding the data stored on computer tapes or disks, as well as documents ^showing the calculations and analytical methods and assumptions used in developing the information with respect to the identified articles.”
■The Indiana Court issued a “Letter Roga-tory” requesting this information which Philip Morris sought unsuccessfully to have enforced here in Louisiana through the subpoena process.
In the trial court, Judge Fedoroff denied Philip Morris’s motion to enforce subpoenas and compel - production and • granted LSU Medical Center’s motion for protective order, adopting by reference Judge Belsome’s “Findings and Reasons” rendered on August 5, 1997 in'the matter of Philip Morris, Incorporated and Philip Morris Products, Inc., Suit No. 97-7908, Division “N”.
Included in those findings is the finding of fact that the Office of Public Health, the LSU Medical Center, Professor Font-ham, and Doctors Chen and Correa “were working in concert ...”[1] This finding of fact is reviewable by this Court only for manifest error. We find no such error. Evidence of the relationship between these individuals, the LSU Medical Center and the Office of Public Health is supported by their deposition testimony and documentary evidence in the record. Dr. Pelayo Correa, M.D., Chairman of the Department of. Pathology for the Louisiana State University Medical Center, was the paid epidemiologist for the Office of Public Health, Louisiana Tumor Registry, at the time of the grant application and during most of the data collection activities under the grant. He was succeeded by Professor Vivien Chen, also of the Louisiana State University Medical Center Pathology Department, who was a co-investigator in the study. At the time of the initial grant application, Professor Chen was a |3paid Associate Epidemiologist for the Office of Public Health, Louisiana Tumor Registry. Professor Chen was specifically responsible for case ascertainment for Louisiana hospitals. Professor Elizabeth T.H. Fontham, is also on the faculty of the LSU Medical Center and a retained epidemiologist for the Office of Public Health, *667 and, like Professor Chen, was listed in the Grant Application as a co-investigator for the research.
The Office of Public health is mandated by law through its Louisiana Tumor Registry program to gather data to aid in the assessment of the presence, extent, possible causes of specific cancers, and other related aspects of cancer cases in Louisiana. LSA-R.S. 40:1299.81. In furtherance of these duties the secretary of the Department of Health and Human Resources is mandated by law to, among other things, collaborate in studies with clinicians and epidemiologists and publish reports on the results of such studies. LSA-R.S. 40:1299.82(5). This is what was done in the instant case with Drs. Correa and Chen and Professor Fontham. Dr. Correa explained in his deposition the importance of working with the Louisiana Tumor Registry because the Registry covered the whole population. Dr. Correa testified that in order to get a grant you had to show that you could do the research and that the Tumor Registry is an essential part of demonstrating that capability.
Dr. Fontham testified that the Office of Public Health could not fulfill its statutory duties without contracts such as those that led to the creation of the so-called “Fontham Study.” Dr. Fontham, when asked if the LSU Medical Center’s involvement in the research was joint with the Office of Public Health responded:
I would say that because Dr. Correa and Dr. Chen are epidemiologists for two institutions, the Office of Public Health and LSU Medical Center. And they are required as part of their relationship with the Office of Public ^Health to conduct such studies, and they are by the nature of their professional affiliation with LSU likewise compelled to conduct such work.
Dr. Fontham explained that outside of Dr. Correa and Dr. Chen, the only other persons within the structure of the Office of Public Health during the relevant time period were non-scientists. Ms. Kirkconnell, the Administrator of the Office of Public Health also testified that Dr. Correa and Dr. Chen were operating as “extensions” of the Office of Public Health.
Documentary evidence in the record supporting the finding of “joint” action includes copies of contracts, treatises and articles. Philip Morris does not dispute this evidence but disagrees with the inference drawn from the evidence by the trial court. As the inference drawn by the trial court of “joint” action is reasonable when the record is reviewed as a whole, we cannot say that the finding of the trial court is erroneous, regardless of the possibility of drawing other reasonable inferences. (By this we do not mean to imply that this Court has found such other inferences, only that Philip Morris argues that they exist.) Consequently, we find no error in the trial court’s conclusion that the privilege found in LSA-R.S. 40:8.1 A & F applies and there was no error in the trial court’s denial of Philip Morris’ discovery request.
Neither Fontham, Chen nor Correa are acting as experts in the Indiana litigation, nor in other related litigation. The trial Court noted that both sides operate from the same level playing field in that the plaintiffs’ experts have no more access to the confidential data than do the defendants’ experts.
|5Judge Belsome’s opinion is so well reasoned that we adopt it as our own, and incorporate it herein by reference, and for the benefit of future readers quote the following portion:
“The Court is also mindful that a decision granting the motion to enforce the subpoena would set a precedent whereby the confidential data behind any published study which is considered by an expert to litigation would be discoverable. As the Federal Seventh Circuit noted in Dow Chemical Company v. Allen, 672 F.2d 1262 (7 Cir.1982):
[Enforcement of the subpoenas would leave the researchers with the knowledge throughout continuation of their studies [that] the fruits of their labors had been appropriated by and were being scrutinized by a not unbiased third party whose interests were arguably antithetical to theirs. It is not difficult to imagine that that realization might well be both unnerving and discourag *668 ing. Indeed, it is probably fair to say that the character and extent of intervention would be such that, regardless of its purpose, it would inevitably tend □[sic] to cheek the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.
Blanket subpoenas of confidential information may chill or inhibit research subjects from participating in studies. Such subpoenas may deter scientists from engaging in research in particular fields. The Seventh Circuit continued, noting that:'
It is not unduly speculative to imagine that a large private corporation, through repeatedly securing broad-based subpoenas requiring total disclosure of all notes, reports, working papers and raw data relating to on-going studies, could make research in a particular field so undesirable as to chill or inhibit whole areas of scientific inquiry.
672 F.2d 1262, 1276 (fn.25). Such a situation could also subject LSUMC to litigation, either under La. R.S. 40:3.1 (g), infra, or for breach of contract. La. R.S. 40:3.1 was enacted to prevent such an [sic] course, and for the Court to rule otherwise would vitiate the clear meaning of the statute.
Philip Morris argues that the researchers waived confidentiality under the statute: There is no indication that a waiver has occurred under La. R.S. 40:3.1. The statute does not indicate that any partial release of information constitutes a waiver of the confidentiality of the whole. In fact, Section H of the statute allows for the release of information, stating: “Nothing in this Section shall prohibit the publishing by the office of public health of statistical complications relating to morbidity and mortality studies which do not identify individual cases and sources of information or religious affiliations.” La. R.S. 40:3.1(H)(West 1992). Philip Morris claims that the release of information by the researchers, both in their published article and to other researchers for pre-publication comment, was in violation of OPH regulations (and thus section H) and constitutes a waiver, citing La. C.E. art. 502. That article states:
A. Waiver. A person upon whom the law confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged. ■
C. ■ Joint waivers. Where two or more persons are joint holders of a privilege, a waiver of the right of |7one joint holder to claim the privilege does not affect the right of another joint holder to claim the privilege.
(West 1995) (Emphasis in Original).
Any violation of OPH regulations, should one have occurred, does not constitute a waiver of confidentiality under La. C.E. art. 502. To allow such an argument would subject all studies and all confidential information to full release because one individual did not follow proper guidelines. Such an argument would also imperil the right to confidentiality of the test subject by the acts of the tester/researcher. The statute clearly'protects against this eventuality by subjecting the individual who improperly released the information to civil suit. It states:
G. Any person who intentionally discloses the content of any confidential data to any third party, except as authorized in this Section, shall be subject to a civil penalty in an amount not less than one thousand dollars and not more than five hundred dollars plus court costs, which shall be paid to the person whose record was unlawfully disclosed. Nothing in this Section shall prevent a person damaged by an unauthorized intentional disclosure from collecting civil damages to the extent of any actual damages suffered because of such disclosure.
(West 1992). This statue [sic] does not, however, subject the study to penalty, which is essentially what a mover’s full release argument would do. This is especially important given the high value society places on confidential data for medical *669 studies. Were a blanket waiver to arise every time a researcher improperly released information, a chilling effect would surface, diminishing the public’s willingness to participate in such studies and decreasing the advance Rof medical research. The fact that Philip Morris does not request identifying information does not diminish the strength of these protections.[2]
Philip Morris also argues that the “Public Record Act”, La. R.S. 44:1 et seq., is inapplicable because this was not a public records request. Were it a public records request, the statute arguably would only protect the information until it is published, which it has been. La. R.S. 44:4(16)(b) states that the Public Records Act shall not apply to:
Data, records, or information produced or collected by or of faculty or staff of state institutions of higher learning in the conduct of or as a result of, study or research on commercial, scientific or technical subjects of a patentable or li-censable nature, whether sponsored by the institution alone or in conjunction with a governmental body or private concern, until such data, records or information have been publicly released, published, or patented.
(West 1997). The court feels an argument could be made that even though the results of the study were published, the raw data was not, and is thus still protected under La. R.S. 44:4(16)(b). The Attorney General has concurred in this belief. He stated:
[A]ny information which pertains to research is deemed to be ‘commercial’ and any person interviewed may be asked if they desire any or all such information they are |9pfoviding to be confidential. Of course, even if not designated as confidential by a person, it may nevertheless be excepted from the Public Records Act by [La. R.S. 44:4(16)(a) ].”
Op.Att.Gen., No. 92-94, June 3, 1992. Regardless, the data is still protected by La. R.S. 44:4(19), which states that the Public Records Act shall not apply “To any records or information defined as ‘confidential data’ as provided in R.S. 40:3.1.” (West 1997)
Philip Morris finally argues that privileges granted by either La. R.S. 40:3.1 or La. R.S. 44:4 should be strictly interpreted, citing Smith v. Lincoln General Hospital, 605 So.2d 1347, 1348 (La.1992) and Mayerhafer v. Roland, 625 So.2d 286, 288-289 (La.App. 4 Cir.1993). The court feels that the privilege contained in the statutes, as applied to the present case, is both reasonable and necessary and falls within the strict interpretation requirement of the discovery rules. La. C.C.P. Art. 1422.”
For the foregoing reasons the judgment of the trial court is affirmed.

AFFIRMED.

. We read Judge Belsome’s use of the phrase "working in concert” as the equivalent of "acting jointly” found in LSA-R.S. 40:3.1.

. Philip Morris cites Stumpf v. Stumpf, 613 So.2d 683 (La.App. 5 Cir. 1993) which states that a partial release of confidential information may necessitate release of the whole. “The focus is on the privilege holder, and the sole concern is whether the privilege holder ‘has committed himself to a course of action that will require the disclosure of a privileged communication.’ ” 613 So.2d 683, 685 (citing Smith v. Kavanaugh, Pierson & Talley, 513 So.2d 1138, 1146 (La.1987)). Again, this case involves a party's medical records, not those of an entire research study. The Court does not believe that this case applies to a study, where publication of results and some data is routine but protection of confidential materials is also routine.